**L. R. FOSTER, Appellant,**

v.

**COMMERCIAL UNION ASSURANCE CO., Ltd., Appellee.**

**No. 7537.**

Court of Civil Appeals of Texas.

Texarkana.

Nov. 19, 1963.

Rehearing Denied Dec. 10, 1963.

R. Philip Schulze, Jr., Houston, for appellant.

L. G. Kratochvil and T. G. Schirmeyer, Houston, for appellee.

DAVIS, Justice.

Plaintiff-appellant sued defendant-appellee to recover damages that resulted from the sinking of his boat, or yacht, the M/V Nataco, under the terms of an insurance policy. The boat, or yacht, was a thirty-two foot Chris-Craft Cruiser. The policy issued February 1, 1960, provided in part as follows:

"\* \* \*

"Coverage. (1) Hull insurance, as per Section 'A'. Amount of insurance $9,500.00. Agreed valuation $9,500.00, Rate $1.80, Premium $171.00.

(2) Protection and Indemnity Insurance, as per Section 'B'. Loss of life and personal injury; Limit, any one person $50,000; Limit, any one acci-

dent $100,000.00; Property damage; Limit, any one accident $50,000.00. Rate, 'Flat', premium $26.78, and Longshoremen's and Harbor Worker's Compensation, as per Section 'C'.

(3) Omnibus Clause, as per Section 'D' included.

(4) Medical Payments Insurance, as per Section 'E'. Limit, any one Acci- ·dent $1,000 included. Total Premium $197.78.

\* \* \*

Layup Warranty: Warranted that the yacht be laid up and out of commission from for the entire to policy term.

\* \* \*

Cruising Warranty: Warranted that the Yacht be confined to Laid-up and out of commission afloat for the entire policy term at Greens Boyou, Texas.
\* \* \* "

On October 16, 1960, the appellant and his brother made repairs on the afterdeck of the boat and removed the gasoline tanks. The hoses connecting the deck drains to the openings of the stern, or transom, of the boat were disconnected from the decking when the decking was being removed. The hoses were tied off and tied upward to prevent water entering the boat. On said date, the boat was tight, floating and in excellent condition. On October 21, 1960, someone notified the appellant that the boat was sunk. No one saw the boat between October 16, 1960, and October 21, 1960. This court must bear in mind that the boat was "laid up and out of commission" at all times after the date of the issuance of the policy up until October 21, 1960. The boat sank in the boathouse and was completely covered by water, except for a small portion of the bow. There were no witnesses to the sinking.

Appellant notified appellee on October 22, 1960, that the boat had sunk. Appellee advised appellant to get someone to raise the boat and to do everything possible to salvage it. Anchor Boat Works was em-

ployed, and they raised the boat on October 22, 1960. The drain fittings in the stern, or transom, of the boat were broken loose and lying in the bottom of the boat, permitting water to enter the boat through the drain holes. The ropes or lines which had tied up the hoses connected to the drain fittings were missing. There were four screws in each drain fitting, and they had been broken loose from the boat, and they too were missing. The hoses were lying in the bottom of the boat. This was discovered because it was necessary to get the boat pumped out, they had to block the drain holes in the stern or transom.

When the boat was afloat, it was removed to Anchor Boat Works and salvaged. Appellee refused to authorize the repairs to the boat. The necessary repairs were made at a cost of $4,520.37. The appellee refused to pay the damages.

The suit was then filed and came on for trial before the court, without a jury. Judgment was entered that the appellant take nothing.

The trial court filed findings of fact and amended findings of fact. He found that under the insurance policy the hull insurance of the boat covered loss directly caused by perils of the sea, vandalism and malicious mischiefs. He found further that the Inchmaree Clause provided coverage against latent defects in the hull or machinery, provided any loss or damage caused had not resulted from the lack of diligence on the part of the owner. The trial court further found that at the time of the sinking of the boat it was "laid up and out of commission, moored and afloat in a boathouse". The trial court further found that the cockpit deck is about 18 inches above the water line when the boat is afloat and moored in calm water, and the purpose of the drains which were exposed at the top of the cockpit deck was to make the exposed stern cockpit self-draining, in the event water entered into the cockpit. There is sufficient evidence to support the trial court's finding of fact as above enumerated.

According to the evidence, the appellee offered proof to show that they had hired an engineer to inspect the boat on February 1, 1960. The engineer testified that there was some seepage into the boat, and he valued the boat at $6,000.00. According to the record, the insurance company issued the policy for $9,500.00.

According to the evidence, the appellee hired the same engineer to inspect the boat about one month after it was sunk, and the trial court made findings of fact as to the testimony of the engineer. There is actually no evidence that the boat was not seaworthy immediately prior to the sinking, unless the provisions of the insurance policy "laid up and out of commission" indicated that the boat was unseaworthy. There are no authorities cited by either the appellant or the appellee on the meaning of "laid up and out of commission", and we have only found three. Since this opinion is going to be a little long, we will merely say that if the insurance was issued because the boat was not seaworthy, then the appellee is bound by the insurance.

The proof that was offered that the boat was not seaworthy was actually the result of an inspection made about thirty days after the boat was sunk. On this evidence, the trial court found that the boat possessed seeps and leaks, and that the appellant did not have the boat repaired as required by the engineer. Bearing in mind that the engineer testified that he examined the boat February 1, 1960, and valued it at $6,000.00, and the insurance company insured it for $9,500.00, doesn't pan out. The testimony that the stern board or transom plank was soft and near the water line at the stern of the boat is not applicable. This testimony shows the result of an inspection more than 30 days after the boat sank and is in direct conflict with the testimony of appellant and another witness that the stern board had to be removed and another board had to be placed in for another reason.

The trial court further found that there were no latent defects in the hull or machin-ery which directly or indirectly caused the boat to sink in calm water, and that the boat did not sink by reason of vandalism, malicious mischief or any other insured peril, including a peril of the sea. The evidence offered by the appellee in endeavoring to prove such facts is wholly insufficient. No one saw the boat from October 16, 1960, until October 21, 1960. On October 21st when the boat was seen, it had been sunk. There was no witness to the sinking. There is evidence that the hoses were broken loose, and the screws were missing which would indicate some form of vandalism or a peril of the sea. The ropes that tied the hoses up were missing. There is no evidence as to what became of the ropes. This would indicate some form of vandalism or a peril of the sea.

Under the findings of fact, the trial court concluded as a matter of law that the appellee was not liable. Appellant has perfected his appeal and brings forward two points of error.

By his Point One, the appellant says the trial court erred in holding that the warranty of seaworthiness had been breached because there is no evidence or insufficient evidence to support such finding.

By his Point Two, he says that the trial court erred in holding that the sinking of the boat was the result of a peril not insured under the terms of the insurance policy.

Under the law, there is an implied warranty of the seaworthiness of a vessel in marine hull insurance policies. There is no breach of such warranty because of the fact that the vessel sinks. Saskatchewan Government Insurance Office v. Spot Pack, Inc., 5 Cir., 242 F.2d 385; Tropical Marine Products, Inc., v. Birmingham Fire Insurance Company of Pennsylvania, 5 Cir., 247 F.2d 116; Mattson v. Connecticut Fire Ins. Co. of Hartford, D.C., 80 F.Supp. 101; Hanover Fire Insurance Company v. Holcombe, 5 Cir., 223 F.2d 844;

**398**

Couch Cyclopedia of Insurance Law, Vol. 5, Sec. 1089.

■ The finding of the trial court that the actual cause of the sinking was not explained, the sinking was not the result of an adventure, and peril of the sea is in error. "Perils of the sea" have been defined by the Commission of Appeals of Texas in an opinion adopted by the Supreme Court in Charles Clarke & Co. v. Mannheim Ins. Co., Tex.Com.App., 210 S. W. 528. The court concluded that there was coverage under the "perils of the sea" clause for a vessel which sank in calm water while tied up alongside another vessel. The sinking was the result of the negligence of a watchman in going to sleep and permitting a fresh water tank to overflow and put the vessel in such a list that it took on sea water and sank.

In the case of Tsalapatas v. Phoenix Ins. Co. of Hartford, Conn., 236 S.C. 508, 115 S.E.2d 49, 83 A.L.R.2d 1451, a boat was insured to be "laid up and out of commission" from October to April. During the month of January the owner took the boat out of the boathouse and carried it for repairs. After the repairs were made, he started back to the boathouse and while the boat was being operated under its own power it struck something underneath the water and sank. The court held that the insurance company was not liable; but, it had this to say:

"The sole question is whether the insured boat is to be considered as being laid up and out of commission at the time the damage was sustained. We have not found any previous decisions in this State upon this question and none have been cited. We have, therefore, considered the reasoning of other Courts under similar questions. * * *

"The manner or custom of laying up and putting out of commission a boat on Lake Murray is not a matter of concern here as it is conceded that the method of storage employed by the insured was sufficient to come within the provisions of the warranty and had the boat sunk or sustained damage while in storage in the boathouse during the warranty period, defendant would have been liable."

In Providence Insurance Company v. Lovett, D.C., 119 F.Supp. 371, a boat was insured to be "laid up and out of commission" from November 1, 1960, to May 1, 1961. The boat sank, and the Federal District Judge held that the boat was "laid up and out of commission" according to the phraseology used in the insurance policy, and that the insurer was liable. The court discussed the meaning of the words "laid up and out of commission", "out of service", and "laid up". The court held that "laid up" and "out of commission" were synonymous. In the minds of various individuals when applied to local custom and practice, the words "laid up" and "out of commission" were ambiguous and uncertain. The words "out of service" to some meant whether the boat was in the water or on the shore. Wigle v. Aetna Casualty Co., D.C., 177 F.Supp. 932, cites the Lovett case.

In this case, according to the insurance policy, the boat was supposed to have been stored on the water. In the Lovett case, the court held that the boat, although moored in wet storage according to the customs of the place until November 25, 1950, when it sank, that the insurer was liable. The points are sustained.

The judgment of the trial court is reversed and the cause is remanded.