**COMMERCIAL UNION ASSURANCE COMPANY, Ltd., Petitioner,**

v.

**L. R. FOSTER, Respondent.**

No. A–9942.

Supreme Court of Texas.

May 20, 1964.

Rehearing Denied June 17, 1964.

T. G. Schirmeyer and L. G. Kratochvil, Houston, for petitioner.

R. Philip Schulze, Houston, for respondent.

SMITH, Justice.

This suit was instituted in the 157th District Court of Harris County, Texas,

by Respondent, L. R. Foster, hereafter referred to as plaintiff, against Petitioner, Commercial Union Assurance Company, Ltd., hereafter referred to as defendant. Plaintiff sought to recover under the terms of a marine insurance policy, which defendant had issued to plaintiff, for a loss arising out of the sinking of plaintiff's yacht, *Nataco*.

The trial court, sitting without the intervention of a jury, entered judgment for defendant. Plaintiff appealed to the Court of Civil Appeals for the First Supreme Judicial District at Houston, Texas. Upon equalization of the dockets of the Courts of Civil Appeals by this court, this cause was subsequently transferred to the Court of Civil Appeals for the Sixth Supreme Judicial District at Texarkana, Texas, which court reversed the judgment and remanded the cause to the trial court. 373 S.W.2d 395. The judgment of the Court of Civil Appeals is reversed and the trial court judgment is affirmed.

The facts are these: On or about February 1, 1960, a Captain Jack Roberts, on behalf of defendant, surveyed the plaintiff's yacht, *Nataco*, to ascertain and report upon the condition of the yacht for underwriting purposes. The yacht is a 32-foot Chris-Craft Cruiser, which is constructed of wood with a flat transom stern and rounded bilge. As a result of his inspection, Captain Roberts recommended that the plaintiff have the *Nataco* hauled out of the water at a marine repair yard, and have necessary repairs made to the hull so that certain seepage in the transom could be stopped.

Defendant issued the marine insurance policy in question to plaintiff, insuring the yacht. The terms of the policy extended from February 1, 1960, to February 1, 1961. Under the hull insurance coverage, the *Nataco* was insured against losses caused by " * * * the adventures and perils of the seas and waters, * * * vandalism and malicious mischief, * *"[1]

The policy further provided that the yacht must "be laid up and out of commission afloat for the entire policy term at Greens Bayou, Texas." In accordance with the policy provisions, plaintiff moored the *Nataco* in his boathouse at the rear of his residence at Greens Bayou, Texas.

On October 16, 1960, plaintiff, together with his brother and brother-in-law, made various repairs aboard the *Nataco*. In general, plaintiff and his associates were attempting to repair the afterdeck of the yacht. In order to accomplish these repairs, it was necessary to remove the "after" section of decking and lift out the gasoline tanks. Certain hoses which connected the deck drains to outside drain fittings in the stern or transom of the yacht were also disconnected from the decking, when the decking was removed. Plaintiff tied off and tied upward these hoses leading from the outside drains in the stern of the vessel. This was done in order to prevent water from entering the hull of the yacht through these outside drain fittings which were near the waterline. This work stopped on October 16, 1960, without plaintiff having replaced the decking or the gasoline tanks. The drain hoses were tied off as described above.

On October 21, 1960, plaintiff was notified that the *Nataco* had sunk at her moorings in plaintiff's boathouse. Plaintiff informed defendant's agent, and was instructed by the agent to employ someone to raise the yacht and do all possible to salvage her. On October 22, 1960, *Nataco* was raised by Anchor Boat Works.

On being raised, the outside drain fittings in the stern were found hanging loose outside the sternboard. In fact, in order to get the yacht pumped out, it was necessary to plug these drain holes in the stern or transom. Furthermore, the lines which had tied up the hoses connected to the outside drain fittings were missing, and the

1. No contention is made in this court that the *Nataco* sank as a result of "vandalism" or "malicious mischief."

hoses were lying in the bottom of the yacht.

Defendant refused to authorize the repair of the *Nataco*. Thereupon, Anchor Boat Works, following plaintiff's instructions, repaired the yacht at the cost of $4,520.37. This suit followed.

In its Findings of Facts, the trial court found, in part, as follows:

"13. The work done by the Plaintiff and his brother and brother-in-law in the vicinity of the transom caused the screws, securing the drain discharge fittings, to give way from an unseaworthy stern board or transom plank at or near the water line at the stern of the NATACO.

\* \* \* \* \* \*

"15. The NATACO did not sink by reason of vandalism or malicious mischief or any other insured peril.

"16. The NATACO did not sink by reason of a peril of the sea, but rather by the failure of Plaintiff to keep and maintain his yacht in a seaworthy condition while the NATACO was afloat in calm water and moored in Plaintiff's boathouse. The water entered the hull of the NATACO through openings in the stern of the yacht where the discharge fittings of the cockpit drains should have been made fast to the stern planking at or near the waterline. There was no external damage to the hull or skin of the NATACO. The NATACO did not sink by reason of some unexplained cause."

Based on these findings, the trial court concluded that plaintiff was not entitled to recover under the terms of the marine insurance policy which defendant had issued to plaintiff.

■ Plaintiff admits that one who purchases a marine insurance policy on the hull of a vessel impliedly warrants that the vessel is seaworthy. Nevertheless, plaintiff argues that it was defendant's burden to prove the *Nataco* was *unseaworthy,* and not plaintiff's burden to prove that she was seaworthy. Plaintiff contends that *all* the evidence shows the *Nataco* was seaworthy prior to the sinking, and that she sank from some unexplained cause. According to plaintiff, this raises a presumption that the yacht's sinking was the result of a "peril of the sea." Inasmuch as there is allegedly no evidence to rebut this presumption, plaintiff concludes that defendant is liable under the insurance policy it issued.

■ On the other hand, defendant contends that the plaintiff has breached the implied warranty of seaworthiness. Defendant admits that if a vessel sinks *at sea,* the insurer has the burden of proving the defense of unseaworthiness. However, defendant argues that the above general rule has no application to a vessel that sinks at her mooring in a safe port. In such a case, defendant contends that there is a presumption of unseaworthiness, and the insured (the plaintiff) must prove that the sinking was caused by a peril insured against. Defendant concludes that there is no evidence that the *Nataco* sank by reason of insured peril and therefore, as a matter of law, she is presumed to have sunk by reason of unseaworthiness. Aside from this alleged legal presumption, defendant contends there is some evidence to support the trial court's finding of unseaworthiness.

■ While the legal issues as to presumptions raise interesting questions of first impression in this jurisprudence, it is unnecessary to pass on these questions inasmuch as we have concluded that there is "some evidence" of probative force to support the trial court's finding that the *Nataco* sank by reason of being unseaworthy.

■ It is an elemental proposition of law that where there is some evidence of a substantial and probative character to support the trial court's findings of fact, they are controlling upon this court and will not

be disturbed, even though this court might have reached a different conclusion therefrom. See Calvert v. Union Producing Company, 154 Tex. 479, 280 S.W.2d 241 (1955); Woodward v. Ortiz, 150 Tex. 75, 237 S.W.2d 286 (1951).

In the present case, it is undisputed that upon raising the *Nataco,* it was discovered that her outside drain fittings at the waterline were loose. These drain holes had to be plugged in order to pump the water out of the yacht. Plaintiff contends there is no proof or explanation as to why these drain fittings were broken loose. On the other hand, the trial court found that the work done by plaintiff in the vicinity of the transom resulted in a loosening of these fittings. The cause of the yacht's sinking could be proven by circumstantial evidence, from which reasonable inferences could be drawn.

From a review of the entire record, we have reached the conclusion that the trial court's finding that "[t]he NATACO did not sink by reason of a peril of the sea, but rather by the failure of Plaintiff to keep and maintain his yacht in a seaworthy condition * * *" is based on reason, and that the evidence supports a reasonable inference and conclusion that the work done by plaintiff resulted in a loosening of the outside drain fittings. This court should never set aside a trial court judgment merely because the trier of facts could have drawn different inferences or conclusions. See Benoit v. Wilson, 150 Tex. 273, 239 S.W.2d 792 (1951).

One other question must be considered in determining the nature of the judgment to be entered in this cause. Plaintiff's brief in the Court of Civil Appeals brought forward two points of error. These points read as follows:

"The Trial Court erred in holding that the warranty of seaworthiness had been breached, as there is no evidence or insufficient evidence to support the finding that the M/V NATA-

CO was unseaworthy prior to the sinking.

"The Trial Court erred in holding that the sinking was the result of a peril *not* insured under the terms of the insurance policy."

Inasmuch as plaintiff used both the terms "no evidence" and "insufficient evidence" in his first point, we construe the latter term as meaning the evidence was *legally* insufficient to support the trial court's judgment and interpret the point as being a "no evidence" point.

Upon sustaining this point, the Court of Civil Appeals *remanded* the cause. This action was apparently taken in order to allow a determination of the plaintiff's damages; the cause was not remanded "in the interest of justice." Under our holding, there is no necessity to remand for a determination of damages.

The judgment of the Court of Civil Appeals is reversed and that of the trial court is affirmed.