**Hugo E. ISUANI, M.D., Appellant,**

v.

**MANSKE–SHEFFIELD RADIOLOGY
GROUP, P.A., Appellee.**

No. 09–90–070 CV.

Court of Appeals of Texas,
Beaumont.

Sept. 13, 1990.

Rehearing Denied Nov. 4, 1990.

George Michael Jamail, Benckenstein, Oxford, Radford & Johnson, Beaumont, for appellant.

Bruce M. Partain, Wells, Peyton, Beard, Greenberg, Hunt & Crawford, Beaumont, for appellee.

## OPINION

BROOKSHIRE, Justice.

Appeal from the granting of a temporary injunction.

### Partial Background Facts

Dr. Hugo Isuani was a full member and an officer of the Manske–Sheffield Radiology Group, P.A. This radiology group practiced their specialty in medicine as well as certain specialized subspecialties in Port Arthur. The group and every member thereof had entered into a contract of employment. The contract of employment contained a non-compete clause. The clause was limited in time to one year and in territory to an area of 15 miles radius measured from St. Mary's Hospital in Port Arthur.

The restrictive agreements and covenants between the partners and members of the radiology group applied equally to each doctor. Dr. Isuani resigned from the

group on March 31, 1990. Two employment contracts had existed. The first one was in 1982. The employment contracts were very similar. Dr. Sheffield, Dr. King, Dr. Isuani, Mr. Hefty, a CPA, and Mr. Greenberg, a lawyer, and a Mr. Joe Vernon, a CPA, attended the meeting that discussed in some detail the first contract of employment. Mr. Hefty was an advisor for Dr. Isuani; Messrs. Greenberg and Vernon were advisors for the group.

Mr. Hefty was a CPA and represented in that capacity and generally—but not legally—Dr. Isuani at the first meeting. The first contract was gone over and the discussion of the contract was on a page by page basis. The record reflects that the employment contract in general and the particular paragraphs in issue were entered into to protect the business interests and the goodwill of the radiology group. In 1982 the group had a contract with St. Mary's Hospital and a contract with Mid–Jefferson County Hospital as well as certain agreements with several of the near-by refineries and other industries. As to the refineries, the agreements were by letter and for the purpose of interpreting X-rays.

Dr. Isuani had apparently not expressed any misapprehension or misunderstanding concerning these restrictive covenants since March of 1982 until sometime in early January of 1990. In January of 1990, Dr. Isuani wanted to leave the group and he indicated to the group that he was free to practice wherever he desired.

Dr. Isuani agreed to and signed a 1987 employment contract with the radiology group. This 1987 contract was applicable to all of the members and officers of the radiology group. The 1987 employment contract came into evidence without objection.

The crucial paragraph of the 1987 contract applied to the other doctors of the group and that crucial paragraph, being paragraph 21, was discussed with Dr. Isuani. Paragraph 21 is the non-competition agreement. Dr. Isuani did not ask any questions concerning paragraph 21 in the 1987 contract.

Some evidence exists that the non-competition agreement was placed in the contract to protect the business interest of the radiology group as well as the good will. The group in 1987 had contracts with the same two hospitals. The group had several private offices as well. At the time the 1987 contract was signed, Dr. Isuani was an officer of the professional association and was a stockholder therein. His annual compensation was the same as the other members of the group and his monthly draw was the same as any other doctor. The monthly draw was $20,000 for Dr. Isuani.

The business interests and the existing contracts that the group had in 1987 were St. Mary's Hospital, Mid–Jefferson County Hospital, Texaco, Gulf Oil (Chevron) and an entity known as Southeast Texas Imaging Center.

The contract also related to future business interests. The general feeling of the group was that if any individual violated the non-competition agreement then any other doctor or member could do so. This would result in the radiology group disintegrating. There existed one other hospital in the area that the Manske–Sheffield group had some dealings with. The group desired to protect this potential future business interest.

The record clearly reflects that Dr. Isuani, while a member of the group, had specialized in certain particular areas and had become very proficient therein. He was said to be the most experienced angiographer in the group. He had had extra training in angioplasty. He had become an expert in temporomandibular joint arthrograms. He had done facet blocks, diskograms, and was exceptionally talented in interventional radiology. He had acquired and perfected these subspecialties while a member of the group and somewhat at the expense of the group. He had also taken additional courses and had become proficient in magnetic resonance imaging (MRI). He had taken courses in 1989 in New Orleans to become proficient in diskograms. He had also taken some prior courses in diskograms. There is evidence that this

additional training had been paid for by Manske–Sheffield.

If Dr. Isuani were allowed to leave the group, then it would take the other members of the group anywhere from two weeks to two months to a year to acquire proficiency in some of the subspecialties of Dr. Isuani. However, in different subspecialties, other members of the same group could and would perform the same.

The one year limitation was explained as being that period of time necessary to properly recruit replacements and properly qualify them in the practice of the group and in some of the subspecialties of Dr. Isuani. The time period in one sense appears reasonable. Some evidence exists that Dr. Isuani would at once commence employment at Park Place Hospital. His brief concedes this point. Park Place Hospital was within the 15 mile limitation. There is evidence that his practice at Park Place would have a negative impact on the business of Manske–Sheffield as well as the good will of the group. It was shown that Dr. Isuani had been requested by a number of referring physicians to do specific work and to perform specific tests for the referring physicians. This business interest probably would no longer come to the group. The group had attempted and had succeeded in building up good will with a number of physicians in the area over the years. This good will enhanced referrals. The referrals were said to be the result of the good will of the group.

This opinion could be unjustifiably extended by the recital of other evidence. For example, Manske–Sheffield had been initially approached by an important person connected with Park Place Hospital for a possible association with that third hospital. These endeavors took place probably in the latter part of 1989. Dr. Isuani's leaving the group and going to work at Park Place, the record reflects, would have a substantial negative impact on the interests and good will of the radiology group.

Another subspecialty developed by Dr. Isuani was that of being a "B" reader. A "B" reader is a radiologist that has been certified in the interpretation of pneumoco-

niosis films. Pneumoconiosis has been described as a type of industrial lung disease or disorder. Industrial companies and lawfirms usually asked for the services of a "B" reader.

Upon a review of the record made on the temporary injunction we cannot hold that the trial judge sitting in equity abused his discretion, but we conclude limited modifications are necessary. By special demand, this matter was advanced on the docket.

The record lucidly demonstrates that the group derived an annual income in 1989 of $2,600,000. It can be said that this is a substantial business interest which the group was trying to protect. There is some evidence of probative force that the members and officers of the group had an annual income of approximately $300,000. The record reflects a genuine concern that the group would lose certain contacts and contracts with some of the companies. These losses could amount to about 15 percent of the gross income. Other industrial plants were involved, such as Neches Butane and Arco Polymer.

In fact, the group established affirmative procedures to build up the good will of the group. This applied especially to the good will in the local, surrounding area. The group encouraged their members to live in Port Arthur or in an area immediately surrounding Port Arthur. In fact, there was a penalty of $5,000 per month for failing to live in the Port Arthur area. This $5,000 per month penalty was not enforced.

There was a reasonable basis for protecting the good will of the group. If a member of the group lived close by the hospitals involved, then emergency care could be provided quickly. If there was an emergency call at night, the specialized medical services could be performed more quickly if the radiologist lived close by the emergency room. We perceive that the group's attempt to protect its good will under the contract of employment was reasonable. We think it had a sound medical basis. That sound medical basis in turn inured to the salutary benefit of the injured, suffering patients.

We think that such considerations as prompt emergency room care and treatment can and should be properly considered by the trial judge.

Furthermore, there exists testimony that the Appellant was entitled to one-sixth of the income of the group and that his name possessed excellent good will.

### The Crucial Paragraph

21. NON–COMPETITION AGREEMENT: It is expressly understood and agreed that upon the termination or expiration of this Contract, Employee will not engage in the practice of medicine in Employee's own name or in association with others, or offer Employee's services as a consultant, employee, independent contractor or otherwise, whether directly or indirectly, within the area having a radius of fifteen miles from St. Mary's Hospital, Port Arthur, Texas, for a period of one year from the termination or expiration of this Contract. Moreover, it is specifically understood and agreed that this covenant and agreement may be enforced by suit for injunction, monetary damages, or both, and without any bond being required or posted.

The first employment contract of 1982 contained a paragraph 19 which was a similar restrictive covenant of non-competition. This earlier document was discussed and gone over with Dr. Isuani and his Certified Public Accountant on a page by page basis inviting any questions that needed to be asked. Neither Dr. Isuani nor his Certified Public Accountant had any discussion or questions concerning paragraph 19.

A radiologist, Dr. King, who served as the president of the group, testified that Dr. Isuani had no objection to either paragraph 19 or paragraph 21. Dr. King explained the reason for the time limitation. The group needed at least a year to find a qualified replacement. The area limitation had to do with the limits and locale of the practice; that is, the specialized radiology practice of the group.

The group was willing to permit former members to practice in Beaumont, Orange, Winnie and other areas. It is significant that all of the members of the group signed identical contracts in 1987. There exists some probative testimony that the group was under consideration by Park Place Hospital, but that the actions of the Appellant put a stop to these negotiations. Testimony exists that if the Appellant were to, with impunity, break the covenant involved, then the impact on the radiology group would be disintegration. This evidence was to be weighed by the trial court. The disintegration of the radiology group certainly would result in a negative impact on a business interest. The income of the group for the year 1989 is spelled out above.

Pursuant to the employment contract, the group had to buy back over a period of six months to one year the stock owned by Dr. Isuani. This buy-back would have a negative impact on the income of the remaining doctors. The record clearly and unequivocally reveals that each member of the group received in salaries and bonuses $300,000 or a figure close thereto for the calendar year 1989. Again, we think this is a reasonable and substantial business interest to the individual radiologists as well as the group. Dr. Isuani participated to the same extent in the salary and bonuses. The contract provided that the buy-out agreement would be the same as to each member of the group.

The record also reflects sworn testimony that Dr. Isuani understood paragraph 21 but said that he was not going to abide by it and further stated specifically that he wanted to go to work at Park Place Hospital.

The Appellant acknowledged that he had a chance to review the employment contract and that he could have obtained his own personal lawyer to review the same. Appellant acknowledged that his financial adviser, a certified public accountant, was with him. Mr. Hefty's role, according to the Appellant, was to look in the financial records and to be a financial adviser and that Hefty reviewed the challenged contract of employment. The Appellant simply stated that he did not see the need to retain an attorney but that he could have

done so and had the opportunity to do so. The Appellant had unequivocally admitted at deposition that he was asked "have you ever been advised by any member of the group that this non-competition agreement does not apply to all members of the professional association?" The unequivocal answer was "no." Appellant understood that each member of the group had a similar, if not identical, restrictive covenant in their contracts of employment. In fact, the contract was the same for each member of the group.

The Appellant acknowledged that he, himself, had terminated his employment with the group. Dr. Isuani acknowledged that with his bonus he was paid $300,000 from the Manske–Sheffield group for the calendar year 1989. Dr. Isuani admitted that if the trial bench elected not to grant the temporary injunction that he intended to join Dr. Nasser in the practice of radiology and since Dr. Nasser's contract was exclusively at the Park Place Hospital, then Dr. Isuani would practice radiology at the Park Place Hospital, within the 15 mile radius of St. Mary's Hospital.

Another member of the group testified that he wanted the contract enforced to protect the business interests of the group. He testified that for several years legitimate attempts had been made to do some radiology work at Park Place Hospital. In fact, the former radiology chief at Park Place Hospital had apparently been relieved of his duties and certain members of the group had been encouraged by certain staff members of the Park Place Hospital for the Manske–Sheffield group to apply for the radiology work there. A meeting took place on this matter including Dr. Isuani. Later, however, the record reflects that the charges against the former radiologist were dropped and the radiologist was reinstated at the Park Place Hospital. This former radiologist, to make the opinion clear, was not Dr. Nasser. This member of the group testified as to other reasons for protecting the business interests.

Yet another specialist in radiology, a member of the group, testified that the Appellant knew a great number of doctors.

The Appellant had a very good following and his leaving the group would really be competition affecting the referral business. This was viewed by one witness as a legitimate business interest and also a legitimate concern about good will.

Dr. Isuani, by his brief, has conceded that he now desires to practice radiology at Park Place Hospital. Appellant concedes that he has talked with Dr. Nasser, a staff radiologist at Park Place Hospital. Appellant thought that he could obtain employment with Dr. Nasser. This would defeat any possibility of the Manske–Sheffield group obtaining a contract with Park Place.

■ The standard for appellate review of the trial court's action in granting the temporary injunction is whether the trial court abused its discretion in granting Manske–Sheffield's pleadings for a temporary injunction. *Loomis Intern., Inc. v. Perkins,* 689 S.W.2d 303 (Tex.App.—Houston [1st Dist.] 1985, no writ). Under established decisional precedents, a litigant seeking a temporary injunction has the burden to establish: (a) that the litigant will probably prevail upon the merits; (b) the litigant will suffer probable irreparable injury in the interim. *DeSantis v. Wackenhut Corp.,* 31 Tex.Sup.Ct.J. 616, 1988 WL 71557 (July 13, 1988, motion for rehearing pending); *Sun Oil Co. v. Whitaker,* 424 S.W.2d 216 (Tex.1978).

TEX.BUS. & COMM.CODE ANN. sec. 15.50(2) (Vernon Supp.1990) provides that a non-competitive agreement or covenant is lawful and can be enforced. The covenant not to compete is enforceable to the extent that it contains reasonable limitations as to time, geographical area, and *scope of activity to be restrained* that do not impose a greater restraint than is necessary to protect the good will or other business interests of the promisee. Sec. 15.50(2). We conclude that the record supports the actions of the trial court which actions were in conformity with Sec. 15.50 with certain specific exceptions.

■ In *Hill v. Mobile Auto Trim, Inc.,* 725 S.W.2d 168 (Tex.1987), the Supreme Court spelled out four criteria that a covenant must meet in order that the non-com-

pete covenant be deemed reasonable and enforceable. The covenant must be necessary for the protection of the promisee, meaning that the promisee is required to have a legitimate interest in protecting business, good will, or trade secrets; next, the covenant must not be oppressive to the promisor, inasmuch as the Supreme Court declared that it was hesitant to validate employee covenants when the employee has nothing but his own labor to sell. In addition, the limitation as to time, territory, and activity in the covenant not to compete must be reasonable. *Third, the covenant must not be injurious to the public since the Texas Courts are reluctant to enforce covenants which prevent competition and deprive the community of needed goods or services.* Lastly, the covenant should be enforced only if the promisee gives valuable consideration.

█ Appellant agrees that the Courts have recognized that one legitimate business interest, which can be protected, would be the preservation of the employer's customers or clients. *Hospital Consultants, Inc. v. Potyka,* 531 S.W.2d 657 (Tex.Civ.App.—San Antonio 1975, writ ref'd n.r.e.). The group had received a number of referrals from other medical doctors who were not specialists in radiology. These referring physicians can legitimately be characterized as customers or clients of the group. There is some evidence that the Appellant's competition would have a probable negative impact on the group's referring physicians. Hence, on this issue, the trial court did not abuse its discretion.

█ Virtually all—if not all—of the subspecialties that the Appellant became proficient in were subspecialties that the other partners did not possess. Hence, the Appellant did not deprive the other members of the group of any so-called trade secrets because the other members of the group simply did not possess the highly advanced skills in the subspecialties of Dr. Isuani.

The subspecialties of Appellant did not become the vested property of the group. The development and the attaining of the subspecialties appertained to Dr. Isuani.

These advanced subspecialties simply cannot be considered to be a secret of the employer group since the other members did not possess the "secret" subspecialties. *See Hospital Consultants, Inc., supra.* The subspecialties of Isuani, therefore, were not confided to him by the other doctors; nor were these subspecialties revealed to him by special techniques known only to the other members of the group. In other words, these subspecialties were not imparted to Isuani by way of confidences expressed to him or secrets expressed to him by the other doctors. Isuani did not breach any trust, nor did he violate any confidence, in attaining the advanced skills of his subspecialties. *Id.*

As we interpret the record, Dr. Isuani was encouraged by the other doctors to take special, advanced seminars and educational courses in his subspecialties. There is a conflict in the record as to who paid for these advanced courses in various specialized fields within radiology. Upon a review and an analysis of the whole record, we determine that the enjoining of Dr. Isuani in the practice of his personal subspecialties—but as to these subspecialties only—is and will be injurious to the public. Nor is this a "populist" concept. Certainly the diseased or injured persons or patients involved will be, in a very realistic sense, injured. The patients will certainly receive an injury.

Note that TEX.BUS. & COMM.CODE ANN. sec. 15.51(b) provides that if the primary purpose of the basic agreement in which the covenant is contained is to obligate the promisor (Isuani) to render personal services (as is the case here), then the promisee (radiology group) has the burden of establishing that the covenant meets the criteria specified by subsection (2) of section 15.50 of this same code. Section 15.-51(b) in the last sentence provides that the burden of establishing a fact means the burden of persuading the fact-finder that the existence of the fact sought is more probable than its non-existence. The group had the burden of showing the reasonableness of the "scope of activity" spelled out in Section 15.50(2). As to the subspecial-

ties personal to Isuani—which the others could not perform—Appellees have failed to show the reasonableness of the scope of activity. The main reason is that Appellees failed in the burden of establishing that the remaining members of the group themselves could perform these subspecialties. Appellees failed to establish that the covenant and its enforcement would not be injurious to the public. Hence, the public health services were limited and imperiled in an injurious manner.

We determine, then, that the temporary injunction will be modified to the extent of, but only to the extent of, permitting Dr. Isuani to perform within the 15 mile radius his subspecialties which are as follows: as a certified "B" reader of X-rays; as a skilled interventional radiologist; the performance of arthrograms, especially temporomandibular joint arthrograms; angiography; angioplasty; diskograms; facet blocks, and magnetic resonance imaging. The writ of temporary injunction is reformed and modified according to the list of subspecialties spelled out immediately above and as reformed and modified is affirmed.

However, after reviewing and analyzing the totality of Dr. Isuani's actions and evidence, it becomes glaringly clear that he is entitled to no additional relief except that spelled out in the immediately preceding paragraph. Of course, the vested pecuniary interest of the Radiology Group in the status quo must yield to the public health and welfare and the public weal.

We are constrained to modify and reform the writ of temporary injunction as entered below because, inter alia, TEX.BUS. & COMM.CODE ANN. sec. 15.05(i) (Vernon 1987) provides that in determining whether a restraint related to professional services is reasonable, the Court is to consider whether the activities involved maintain or improve the quality of the professional services to the benefit of the public interest; and, secondly, whether the enjoined activities involved limit or reduce the cost of such professional services to the benefit of the public interest. The restraint on professional services is not reasonable if it unlimits or increases the cost of such services to the detriment of the public interest. These considerations are not the sole basis of our opinion. Of course, professional services mean services performed by a licensed physician. Sec. 15.05(i).

Consideration has been given to the paramount question before the trial court; i.e., whether Manske–Sheffield Radiology Group was entitled to the preservation of the status quo of the subject matter of the litigation pending a trial on the merits for a permanent injunction. We do not take the position in this opinion that the merits of the underlying cause of action are presented to us for appellate review. It is recognized that our review of the temporary injunction is limited to a determination of whether there has been a clear abuse of discretion by the trial judge. However, because of the unique procedural posture, we can confidently write that there is no denial to any party of the right to a trial by jury. No party requested or demanded a jury trial to determine the issuance of a permanent injunction.

We sanguinely hold, however, that the trial court can and did abuse its discretion when the writ of temporary injunction was in contravention of statutory law and also in contravention of Supreme Court decisional precedents. Furthermore, we can reasonably assume that the evidence taken at the hearing on the temporary injunction will be virtually the same as the evidence developed at the trial on the merits on the permanent injunction. The review of the record on the temporary injunction fails to disclose crucial, dispositive factual disputes. We have reformed and modified the writ of temporary injunction because we think that there will be irreparable injuries and harm to the public, to the public health, and to the public weal as well as the public well-being and welfare. We perceive, then, that our opinion is in conformity with *Brooks v. Expo Chemical Co., Inc.*, 576 S.W.2d 369 (Tex.1979) and *Davis v. Huey*, 571 S.W.2d 859 (Tex.1978).

We are aware of and acknowledge the general rule that a temporary injunction expires when the trial judge renders a final

judgment. *Independent American Real Estate v. Davis,* 735 S.W.2d 256 (Tex.App. —Dallas 1987, no writ). The usual purpose for a temporary injunction is to preserve the status quo of the subject matter of the suit pending a trial on the merits to final judgment. *Id.* Here, however, the public health, public welfare and public weal paramountly intervene and supersede the usual rule.

A permanent injunction entitled a Final Judgment was entered on the trial on the merits of the severed cause of action. A jury was specifically waived by all the parties. In the final judgment the court found and concluded that paragraph 21 of the employment contract of Isuani with Manske–Sheffield dated May 6, 1987, is enforceable in its entirety. Further, we can safely pronounce that the record made on the permanent injunction is virtually the same as that made on the temporary injunction. At least one of the parties has demanded the right to present oral argument and this oral submission cannot be heard until sometime in 1991. Hence, protecting the public health, welfare and weal and being deeply concerned about the quality and availability of adequate medical services available to the people of Mid–Jefferson County and Port Arthur, we have issued this Opinion on the appeal from the temporary injunction.

TEMPORARY INJUNCTION MODIFIED AND REFORMED; AND AS SUCH, AFFIRMED.

BURGESS, Justice, dissenting.

I respectfully dissent. This appeal is moot, thus the majority opinion is an advisory one. The majority recognizes the general rule that a temporary injunction expires when the trial judge renders a final judgment, then, without authority, announces an exception.

Since I would dismiss the appeal as moot, I reserve comment on the merits until the appeal of the permanent injunction is properly before us.