Hugo E. ISUANI, M.D., Appellant,

v.

MANSKE–SHEFFIELD RADIOLOGY GROUP, P.A., Appellee.

No. 09–90–113 CV.

Court of Appeals of Texas, Beaumont.

Feb. 28, 1991.

Rehearing Denied March 14, 1991.

George Michael Jamail, Benckenstein, Oxford & Johnson, Beaumont, for appellant.

Bruce M. Partain, Wells, Peyton, Beard, Greenberg, Hunt & Crawford, Beaumont, for appellee.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

BROOKSHIRE, Justice.

At a previous time, on September 13, 1990, the Court issued an opinion resulting from an appeal from the granting of a temporary injunction favorable to Manske–Sheffield. This opinion concerns an appeal by Dr. Isuani from the granting of a permanent injunction. Our previous opinion (one Justice dissenting) is reported in 798 S.W.2d 346.

We are presented now with a transcription of the reporter's notes covering a non-jury trial on the merits for the permanent injunction, having been conducted on June 4, 1990. We also have before us the record made on June 5, 1990, entitled the Court's Final Ruling and Hearing on Bond.

The trial on the merits for the permanent injunction was a bench trial. The parties and their attorneys agreed to reoffer on the merits all of the evidence that was admitted on the temporary injunction hearing for the consideration of the bench. The method used was that one of the parties actually offered and retendered what was described as Exhibits No. 1 and No. 2 on the merits of the case. Exhibits 1 and 2 were the transcript and the statement of facts from the temporary injunction hearing. The opposing attorney had no objection and, in fact, made this statement:

—The only thing I have to say, pursuant to the Rules of Evidence, Rule 200, we're

asking you to take judicial notice of all prior testimony.

I don't know how you're going to handle this. It does need to be made a part of the record, assuming there is going to be an appeal from one side or the other. . . .

In addition to Exhibits 1 and 2, there existed twelve more pages which had been in some manner not copied. These twelve pages consisted of certain testimony of Dr. Sheffield. These twelve pages were identified and placed in evidence in the trial on the merits as Exhibit No. 3. Isuani's Exhibit No. 1 consisted of a series of W–2 wage and tax statements for 1988, setting forth the "wages, tips, and other compensations" made by a number of the members of the radiology group. We use the wording of the IRS W–2 form. For calendar 1988, although it is difficult to be absolutely certain because of the poor quality of the exhibits, we think, using a magnifying glass, that about half of the members of the group grossed about $278,717 while other members of the group grossed about $286,717. Dr. Isuani, in 1988, if we can properly decipher his W–2 statement, made $286,717. Upon a more careful examination with a more powerful magnifying glass, we think that all of the doctors who were members of the group in 1988 made $286,717 with the exception of one doctor who apparently was the youngest of the group, his income being $278,717.

The next exhibits were the W–2 statements for the calendar year 1987. Dr. Isuani and some others are shown to have made $287,000. Two of the younger members made about $206,004 and $218,460. The balance of the exhibit shows check stub entries and check records, the last exhibit being Isuani's Exhibit No. 4, the W–2 wage and tax statements for calendar year 1989. There it appears that most of the partners made $315,000 or possibly in one case, $318,000. Dr. Isuani's "wages, tips, and other compensation" on line 10 of the IRS form appears to be $315,000, which is apparently the same figure as made by the other radiologists. We recite these figures to demonstrate that significant business interests were involved.

The last exhibit is from the Whittaker Medical Services Group, Inc., for June and May of 1990 wherein Dr. Isuani apparently made a total of $13,558. Again, we have carefully reconsidered the entire record before us and we fail to perceive how in a meaningful and in a distinguishing way the non-jury trial on the merits differs from the record made at the hearing on the temporary injunction. In fact, from reading the dialogue and from the arguments of both counsel—the arguments being able and eloquent—it seems that both attorneys wanted to, in a very realistic sense, resubmit the same statement of facts that was made at the temporary hearing again to the trial court as the record on the permanent hearing.

We must stress that the evidence that was taken at the hearing on the temporary injunction was and is virtually and practically identical to the evidence developed at the trial on the merits. At the trial on the merits, of course, Manske–Sheffield prevailed and was awarded a permanent injunction against Dr. Isuani. At the beginning of the trial on the merits, it was actually stipulated and agreed to by both parties and their counselors that the testimony and evidence adduced and the record developed at the evidentiary hearing on the temporary injunction was to be the testimony, evidence, and record for the purposes of the trial to the bench on the very merits of the permanent injunction. We have attempted to review and summarize above the few additional strains of evidence adduced at the trial on the merits. We conclude that the entire record on the merits simply fails to reveal any crucial or differently dispositive factual matters.

We recognize and agree that the standard of review is different in the appeal of the granting of a temporary injunction as distinguished from the granting of a permanent injunction. Nevertheless, Dr. Isuani in his earlier appeal, had challenged both the factual sufficiency of the evidence and the legal sufficiency of the evidence. We attempted to discuss these points at some length in our previous opinion dated September 13, 1990. There we attempted to

analyze and carefully consider the evidence presented. We determined that Manske–Sheffield business interests as well as its good will had been impacted by Dr. Isuani's actions. We determined in September of 1990 that the legitimate business interests of Manske–Sheffield and the good will attendant thereon justified the granting of the temporary relief and temporary injunction. We basically affirmed the action of the trial court, however, we did issue some limiting modifications in the interest of the public good and the welfare and the good health of the citizens and residents of mid and south Jefferson County.

■ A prevailing, successful petitioner for injunctive relief must demonstrate the following grounds:

(1) the existence of a wrongful act;

(2) the existence of imminent harm;

(3) the existence of irreparable injury; and,

(4) the absence of an adequate and realistically complete remedy at law.

See *Frey v. DeCordova Bend Estates Owners Ass'n,* 632 S.W.2d 877 (Tex.App.—Fort Worth 1982). This case was affirmed by the Texas Supreme Court in March of 1983 at 647 S.W.2d 246. The affirmance by the Supreme Court was without a dissent.

■ In a supplemental transcript, we find findings of fact and conclusions of law. The trial court said that they were made pursuant to Tex.R.Civ.P. 269 and at the request of Hugo E. Isuani, defendant below. We have carefully reviewed the findings of fact which were seven in number and the separately filed conclusions of law which were twelve in number, signed on July 2, 1990, by Honorable Donald J. Floyd, Judge Presiding.

### Findings of Fact

(1) Hugo E. Isuani ("Isuani") is a physician licensed to practice medicine in the State of Texas and was a stockholder, director, officer and employee of the Manske–Sheffield Radiology Group, P.A. ("Manske–Sheffield"), until March 31, 1990.

(2) Manske–Sheffield is a Texas Professional Association engaged in the practice of medicine.

(3) Prior to commencing employment with Manske–Sheffield in 1982, Isuani executed an Employment Contract that contained a Covenant Not to Compete. On or about March 6, 1987, Isuani executed another Employment Contract with Manske–Sheffield which contained a Covenant Not to Compete, as follows:

Paragraph 21. NON–COMPETITION AGREEMENT: It is expressly understood and agreed that upon the termination or expiration of this contract, Employee will not engage in the practice of medicine in Employee's own name or in association with others, or offer Employee's services as a consultant, employee, independent contractor or otherwise, whether directly or indirectly, within the area having a radius of fifteen (15) miles from St. Mary Hospital, Port Arthur, Texas, for a period of one (1) year from the termination or expiration of this contract. Moreover, it is specifically understood and agreed that this covenant and agreement may be enforced by suit for injunction, monetary damages, or both, and without a bond being required or posted.

Each physician employee of Manske–Sheffield executed a contract containing a Covenant Not to Compete identical to that contained in Isuani's Employment Contract.

(4) On or about January 8, 1990, Isuani notified Manske–Sheffield of his intention to withdraw from the Manske–Sheffield group effective March 31, 1990. He subsequently stated that it was his intention to practice medicine at Park Place Hospital in Port Arthur, Texas, which is within a fifteen (15) mile radius of St. Mary Hospital.

(5) As a result of Isuani's voluntary withdrawal from Manske–Sheffield, Manske–Sheffield is required to repurchase Isuani's stock in Manske–Sheffield.

(6) Manske–Sheffield renders professional medical services to St. Mary Hospital in Port Arthur, Texas, Mid–Jeffer-

son Hospital in Nederland, Texas, and several refineries, chemical plants, and other businesses in the Port Arthur area under written agreements which are terminable by either party.

(7) Manske–Sheffield, with Isuani's knowledge and consent, has negotiated with Park Place Hospital and Dr. Nasser, the radiologist at Park Place Hospital, in pursuit of an agreement wherein Manske–Sheffield would provide Park Place Hospital with professional radiology services.

### Conclusions of Law

(1) Paragraph 21 of Isuani's Employment Contract with Manske–Sheffield, executed by Isuani on May 6, 1987, is enforceable and ancillary to the enforceable Employment Contract and is, therefore, not violative of Texas Business & Commerce Code § 15.50.

(2) Paragraph 21 of the Employment Contract contains reasonable limitations as to time, geographical area, and scope of activity to be restrained that do not impose a greater restraint than is necessary to protect the good will or other business interests of Manske–Sheffield.

(3) Manske–Sheffield has legitimate business interests or good will which must be protected by the issuance of an injunction against Isuani enforcing the provisions of Paragraph 21 of the Employment Contract.

(4) The Court finds that the restrictions in Paragraph 21 of the May 6, 1987 Employment Contract are reasonable and not oppressive since Isuani may practice medicine outside the fifteen-mile radius from St. Mary Hospital.

(5) Ample consideration exists to support the May 6, 1987 Employment Contract.

(6) The granting of an injunction enforcing the provisions of Paragraph 21 will not be injurious to the public since, as testified to by Isuani, the remaining members of Manske–Sheffield can perform all procedures previously performed by Isuani.

(7) There was no mental stress or duress imposed on Isuani at the time he executed the May 6, 1987 Employment Contract with Manske–Sheffield.

(8) If an injunction is not granted prohibiting, enjoining, and restraining Isuani in the practice of medicine in Isuani's own name or in association with others, or prohibiting Isuani from offering his services as a consultant, employee, independent contractor, or otherwise, directly or indirectly, within the area having a radius of fifteen (15) miles from St. Mary Hospital, Port Arthur, Texas, for a period of no longer than one (1) year from the termination of his employment with Manske–Sheffield on March 31, 1990, it is more probable than not that Manske–Sheffield will sustain irreparable harm to its business interests or good will. Manske–Sheffield is without an adequate remedy at law in the event Isuani violates the provisions of Paragraph 21 of the May 6, 1987 Employment Contract with Manske–Sheffield.

(9) Manske–Sheffield is entitled to an injunction against Isuani as set forth in Paragraph (8) and judgment against Isuani.

(10) The Temporary Injunction Bond of Manske–Sheffield, as Principal, and Fidelity & Deposit Company of Maryland, as Surety, which was filed and approved on April 11, 1990, is dissolved.

(11) All costs of court are taxed against Defendant Isuani for which let execution issue.

(12) To the extent any Finding of Fact set forth above is a Conclusion of Law, it is adopted as such. To the extent any Conclusion of Law set forth above is a Finding of Fact, it is adopted as such.

We conclude that there is evidence of probative force and evaluation to support the findings of fact. We agree and affirm the conclusions of law. We stress that we do confirm the conclusion of law No. 7.

■ The granting or the refusal of a permanent injunction is within the sound discretion of the trial court if a bench trial has been conducted. On appeal, the review of the trial court's action is usually limited

to the question of whether such action constituted an abuse of discretion. *Priest v. Texas Animal Health Com'n*, 780 S.W.2d 874 (Tex.App.—Dallas 1989, no writ). However, where the record and the facts clearly demonstrate that one party is violating the substantive law, it then becomes the duty of the chancellor to enjoin that violation. In such cases, it has been said that there is simply no judicial discretion to be exercised. *City of Houston v. Memorial Bend Utility Company*, 331 S.W.2d 418 (Tex.Civ.App.—Houston 1960, writ ref'd n.r.e.).

■ The trial chancellor then is the officer who decides the propriety of the equitable relief sought by injunction. It is for the Court to consider and determine whether a wrong or an injury might be anticipated and whether equity powers should be exercised in cases for temporary and permanent injunctions. *See State v. Texas Pet Foods, Inc.*, 591 S.W.2d 800 (Tex.1979). The trial trier of facts may even draw reasonable inferences from the evidence and from the testimony. Hence, the chancellor's findings of fact may not be disregarded on appeal if the record contains evidence of probative value from which these reasonable inferences may be drawn. *Ray v. Farmers State Bank of Hart*, 576 S.W.2d 607 (Tex.1979). Indeed, if there exists some evidence of probative force and of substantial character and evaluation to support the chancellor's findings of fact, then those findings are controlling upon the appellate reviewing court and will not be disturbed. *Commercial Union Assurance Company v. Foster*, 379 S.W.2d 320 (Tex.1964); *Central Power & Light Co. v. Bullock*, 696 S.W.2d 30 (Tex.App.—Austin 1984, *no writ*).

The chancellor sitting in equity in his findings of fact did not find facts under this record that were so against the overwhelming weight and preponderance of the evidence as to be clearly and manifestly wrong and unjust. In fact, we hold that there is ample evidence of probative valuation to sustain the findings of fact below as well as the separately filed conclusions of law. We perceive and conclude that the issues of fact and of law that were presented at the two different hearings were identical.

Abuse of discretion is usually described as a whimsical act, arbitrary act, capricious act—that has no relationship to relevancy. Abuse of discretion usually means it has prejudicial effect only against a party and has little or no qualities of tending to prove a fact or an issue that would justify the said evidence to be introduced before the fact-finder.

Abuse of discretion also carries with it the concept that the trial court acted unreasonably. Abuse of discretion usually means something very differently from what the reviewing appellate court would have felt necessarily called upon to do. Nevertheless, an appellate court cannot be a superior trial judge. Such a concept of the appellate jurist being a superior trial judge is definitely the antithesis of abuse of discretion and not its embodiment. A very appropriate test expressed in other language is that the test of abuse of discretion is whether the court below acted without reference to any guiding rules and principles. Simply put, did the trial judge act arbitrarily or unreasonably? We hold the trial judge acted reasonably.

The appellate jurist must always remember and heed the truism that we have before us cold written records. We must afford the trial court discretion because the trial court judge is in a superior position to appraise the impact of the probative force of the evidence. The trial court judge sees and observes the witnesses, the defendants, the jurors (if any), and the lawyers; the trial court alone is in a position to witness all the participants' mannerisms and reactions. The trial court alone can weigh the intonation of the voices and the demeanors and acts and mannerisms of the witnesses. The trial chancellor alone can determine the impact or reaction of the jury, if any, or even himself to the pieces and strings and strains of the evidence. Indeed, he alone can judge and weigh the success and force of impeachment by cross-examination through careful observation.

These concepts are especially valid in a bench trial in equity.

 As we understand the record, the trial court set the amount of a proper supersedeas bond required of Dr. Isuani. Dr. Isuani did not make the supersedeas bond. We perceive that the amount of the supersedeas bond was reasonable. We hold that there was no abuse of discretion. Concerning the $500,000 supersedeas bond, as we analyze the hearing on the bonds, Appellant conceded that Manske–Sheffield possessed an ongoing business interest, at least to the extent of requiring Manske–Sheffield to post a bond. Appellant's counsel argued for a balancing of the equities. We conclude, pursuant to TEX.R.APP.P. 47(f), that the trial chancellor had broad, ample discretion to order the bonds involved and to set the amounts thereof. Indeed, the trial court has discretion to decline to permit the judgment to be suspended upon the filing by Manske–Sheffield of security as ordered. Furthermore, the trial court has continuing jurisdiction even during the pendency of an appeal and after the expiration of the trial court's plenary power to modify the amount or the type of security required. TEX.R.APP.P. 47(k). Appellant has not applied for relief under Rule 47(k). The record reflects, we perceive, by an exhibit of Dr. Isuani that the gross income for 1989 for the Manske–Sheffield Radiology Group was very close to $2,600,000. We also perceive that Appellant contended that he was going to assert a million dollars in damages. The chancellor within his broad discretion could have found and did properly find that the supersedeas bond was reasonable, the chancellor reasoning that if Dr. Isuani was to be damaged a million dollars, then Manske–Sheffield would sustain about the same substantial harm or damage.

Recently, the Supreme Court of Texas in a Per Curiam opinion handed down an opinion concerning Dr. Isuani's appeal from the temporary injunction. *Isuani v. Manske–Sheffield*, 802 S.W.2d 235 (1991). We have, of course, adhered to this opinion and we have followed the Supreme Court's mandate. Hence, the judgment of our Ninth Court of Appeals is reversed as to the temporary injunction; all of our previous orders pertaining to the temporary injunction are dissolved; Dr. Isuani's appeal from the temporary injunction is dismissed; and, Manske–Sheffield Radiology Group, P.A., shall recover from Hugo E. Isuani, M.D., and his surety, Benckenstein, Oxford, Radford & Johnson, who shall pay the costs in the Supreme Court and in the Ninth Court of Appeals.

AFFIRMED.

BURGESS, Justice, dissenting.

I respectfully dissent. I would hold that Manske–Sheffield is not entitled to a permanent injunction because they have not proven "the absence of an adequate and realistically complete remedy at law." It was their burden to prove the absence of a remedy at law, not the burden of Isuani to prove a remedy did exist. Both the majority and Manske–Sheffield place emphasis and reliance upon the fact that Manske–Sheffield had talked or "negotiated" with Park Place Hospital about a contract to provide radiology services. They use this fact to show that Manske–Sheffield had a business interest to protect. In their brief Manske–Sheffield makes the statement, without any support in the record, that it is "difficult or impossible to place a monetary value on this interest [the pursuit of the Park Place contract] to Manske–Sheffield." Once again, there is nothing in the record, not even the opinion of a Manske–Sheffield radiologist, that Isuani's interference with a Park Place contract is incapable of being assigned a monetary value. This conclusion simply defies common sense. What group of trained professionals would consider a contract without having some projection of the potential profits?

The evidence showed that Manske–Sheffield received its income from contracts and/or doctor referrals. If, after he left the group, Isuani diverted some of those contracts or referrals, then that lost income is capable of being calculated and Isuani

could face a suit for damages.[1] *See Hogg v. Professional Pathology Associates*, 598 S.W.2d 328 (Tex.Civ.App.—Houston [14th Dist.] 1980, writ dism'd).

The trial court should have allowed Isuani to practice radiology at Park Place Hospital if he so desired. Then Manske–Sheffield could have sued Isuani and could have collected whatever monetary damages, if any, they proved they had lost. The injustice of the trial court's ruling and the majority's affirmance is that Dr. Isuani has been deprived of the right to practice radiology at a place where Manske–Sheffield admittedly was not practicing radiology and did not prove they were likely to do so. I respectfully dissent.

---

**1.** Apparently the trial court had no difficulty in assigning a value of $500,000 to the Park Place "business interest" since that was the amount of supersedeas bond required of Isuani.